J-S19044-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                     :            PENNSYLVANIA
                     :
          v.            :
                     :
                     :
JOSEPH  BLEDSOE,        :
                     :
        Appellant     :      No. 1552 EDA 2019

Appeal from the Judgment of Sentence Entered September 14, 2018
in the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0006872-2015

BEFORE:  BOWES, J., McCAFFERY, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          Filed: July 16, 2020

Joseph Bledsoe ("Bledsoe") appeals, *nunc pro tunc*, from the judgment of sentence entered following his conviction of one count each of rape, involuntary deviate sexual intercourse ("IDSI"), sexual assault, incest, endangering the welfare of a child, corrupting the morals of a minor, statutory sexual assault, unlawful contact with a minor, and intimidation in a child abuse case.[1]  We affirm.

The trial court described the trial evidence, viewed in a light most favorable to the Commonwealth, as follows:

> Between August of 2013, and February 19, 2015, [Bledsoe] had a sexual relationship with his biological daughter, K.[(also referred to as "the victim")], who[,] at the time[,] was between the ages of 15 and 16[,] and was living with [Bledsoe].  In August of 2013, K.[] moved in with [Bledsoe] and her grandmother in

---

[1] 18 Pa.C.S.A. §§ 3121(a), 3123(a)(1), 3124.1, 4302(a), 4304(a)(1), 6301(a)(1)(ii), 3122.1(b), 6318(a)(1), 4958(a)(2)(ii).

West Philadelphia. Before that, she had lived with her mother, step-father[,] and other siblings, and [Bledsoe] had been absent from her life since she was approximately 2 or 3 years old.

[Bledsoe] and K.[]'s first sexual encounter occurred a few months before she moved in with him. K.[] and her younger sister, also [Bledsoe's] daughter, spent the night at [Bledsoe's] house. Both girls were watching television on the couch. After K.[]'s sister fell asleep on the couch, [Bledsoe] brought K.[] upstairs to his bedroom and performed oral sex on her, made her perform oral sex on him, and then engaged in vaginal intercourse with her. After having sex with K.[], [Bledsoe] told her that what they did was their "secret[,]" and that he would get in trouble if she told anyone.

Shortly after K.[] moved in with [Bledsoe] in August of 2013, [Bledsoe] and K.[] began regularly engaging in sexual activity. From that time until the last time they engaged in sexual activity on February 19, 2015, a time period of nearly a year and a half, [Bledsoe] and K.[] had sex a few times a week. This included oral and vaginal sex. During this time, [Bledsoe] would withhold money, such as money for lunch, or not pay for things like clothes, shoes, and K.[]'s cell phone[,] unless K.[] continued having sex with him.

In February of 2015, K.[] told her boyfriend[,] George Campbell [("Campbell"),] about her sexual encounters with her father. Campbell insisted that K.[] should report [Bledsoe's] conduct to the police, but she did not want to get the police involved. On February 22, 2015, Campbell came to [Bledsoe's] house to confront [Bledsoe] about what K.[] had told him, but [Bledsoe] demanded that Campbell leave. However, a few hours later, Campbell came back to the house to again confront [Bledsoe], but [Bledsoe] refused to let him inside. K.[] attempted to go outside to see Campbell, but [Bledsoe] physically restrained her from doing so. Campbell heard the struggle going on inside the house and called the police. When the police arrived, they heard screaming and a commotion coming from inside the house. Police knocked on the door, identified themselves, and asked the occupants to open the door. When [Bledsoe] opened the door, K.[] rushed out of the house crying. [Bledsoe] and Campbell started yelling at each other, and [Bledsoe] proceeded to run towards Campbell. Police ordered [Bledsoe] to stop and then physically restrained him when he failed to do so. After police put

- 2 -

[Bledsoe] in the back of their vehicle, [Bledsoe] began yelling for K.[] and saying he wanted to speak to her. Meanwhile, K.[] informed Officer Geneva Russell that [Bledsoe] had been sexually abusing her. When this information was relayed to the other officers on the scene, [Bledsoe] was placed under arrest.

… K.[] was transported to Philadelphia Children Alliance, where she told staff about her sexual relationship with [Bledsoe]. On February 23, 2018, a sexual assault nurse performed a forensic examination on K.[] and collected DNA from inside [of] her vagina. Later, detectives collected DNA swabs from [Bledsoe] and Campbell. The DNA found inside [of] K.[]'s vagina matched that of [Bledsoe].

On March 8, 2015, [Bledsoe] called K.[] from prison and instructed her to tell detectives that she and Campbell had planted [Bledsoe's] sperm in her vagina. Again, K.[] did as [Bledsoe] instructed and testified at [Bledsoe's] preliminary hearing on June 18, 2015, that she and Campbell had planted [Bledsoe's] semen in her vagina.

Trial Court Opinion, 2/15/19, at 3-5 (citations and footnote omitted).

A jury subsequently convicted Bledsoe of the above-described charges. On September 14, 2018, the trial court sentenced Bledsoe to an aggregate term of 35-70 years in prison. Bledsoe filed post-sentence Motions on September 21, 2018. On September 25, 2018, the trial court granted trial counsel's request to withdraw from representation, and appointed James Berardinelli ("Attorney Berardinelli") to represent Bledsoe for litigation of his post-sentence Motions and any appeal. However, while the post-sentence Motions were pending, Bledsoe filed a *pro se* Notice of Appeal, which was docketed at 2964 EDA 2018. On December 28, 2018, the trial court denied Bledsoe's post-sentence Motions, thereby perfecting Bledsoe's appeal to the Superior Court. *See Commonwealth v. Cooper*, 27 A.3d 994, 1008 (Pa.

2011) (stating that when a premature appeal is filed during the pendency of post-sentence motions, the trial court retains jurisdiction to decide the motions; the appeal is perfected upon the filing of an order denying post-sentence motions).[2] Thereafter, Bledsoe filed a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal. The trial court filed an Opinion on February 15, 2019.

On May 16, 2019, this Court dismissed Bledsoe's appeal filed at docket number 2964 EDA 2018, because his counsel had failed to file an appellate brief. That same day, Bledsoe filed a counseled Petition for relief pursuant to the Post Conviction Relief Act ("PCRA"),[3] seeking reinstatement of his direct appeal rights, *nunc pro tunc*. The PCRA court granted Bledsoe's Petition on May 24, 2019. Thereafter, Bledsoe filed the instant *nunc pro tunc* appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Bledsoe presents the following claims for our review:

I. Is [Bledsoe] entitled to an arrest of judgment and/or a new trial in the above[-]captioned matter on the ground that the evidence was insufficient to establish the offenses of [r]ape by

---

[2] Bledsoe filed two additional Notices of Appeal from the same judgment of sentence. On December 12, 2018, Bledsoe re-filed the Notice of Appeal that he had filed at 2964 EDA 2018, which this Court docketed at 100 EDA 2019. On January 22, 2019, Attorney Berardinelli filed a counseled Notice of Appeal, which this Court docketed at 255 EDA 2019. This Court ultimately dismissed the appeals filed at 2964 EDA 2018 and 100 EDA 2019 as duplicative of the appeal filed at 255 EDA 2019.

[3] **See** 42 Pa.C.S.A. §§ 9541-9546.

[f]orcible [c]ompulsion and [IDSI,] since the Commonwealth's evidence failed to establish that the sexual intercourse and deviate sexual intercourse in question was accomplished through forcible compulsion?

II. Did the lower court err in precluding evidence of sexual activity between [K.] and her boyfriend as a potential source of the sperm discovered by the [K.]'s rape kit?

III. Did the [trial] court err[] in permitting Dr. Ralph Riviello [("Dr. Riviello")] to testify to the contents of the [K.]'s medical records when he had not been qualified as a records custodian and the Commonwealth failed to lay the proper foundation for a business record?

Brief for Appellant at 2-3.

Bledsoe first challenges the sufficiency of the evidence underlying his convictions of rape by forcible compulsion and IDSI. *See id.* at 9. Specifically, Bledsoe claims that the Commonwealth failed to prove the element of forcible compulsion, which is necessary to establish each offense. *See id.* According to Bledsoe, "K.[] did not describe being exposed to any physical coercion during the course of her sexual relationship with [Bledsoe]." *Id.* at 10. Bledsoe disputes the trial court's statement that he had refused to pay for clothing or K.'s cell phone unless she had sex with him. *Id.* Bledsoe asserts that this is a mischaracterization of K.'s testimony. *Id.*

Bledsoe argues that, in her testimony, K. indicated that, upon revealing to Bledsoe that she had a boyfriend, she did not receive "lunch money or stuff like that or [a] new pair of shoes, or something like that." *Id.* Bledsoe states, "Thus, it is clear that [his] decision to withhold food or clothing from K. was not contingent upon her engaging in sex, but rather, her involvement with her

- 5 -

boyfriend, of whom [Bledsoe] did not approve." *Id.* at 10-11. According to Bledsoe, "the only remaining factors cited by the [trial] court to establish forcible compulsion[] were the age and relationship of the parties." *Id.* at 11.

In its Opinion, the trial court set forth the appropriate law, addressed Bledsoe's claim, and concluded that it lacks merit. *See* Trial Court Opinion, 2/15/19, at 6-11. We agree with and affirm on the basis of the trial court's Opinion with regard to Bledsoe's first claim. *See id.*

In his second claim, Bledsoe argues that the trial court improperly disallowed evidence related to K. and her boyfriend, "when the intended purpose was to establish the boyfriend as a potential source of the sperm discovered by the [K.]'s rape kit." Brief for Appellant at 11. Bledsoe acknowledges that evidence related to a victim's sexual past is inadmissible. *Id.* Bledsoe argues, however, that such evidence is admissible to demonstrate an alternative source of the semen found in the victim. *Id.* According to Bledsoe, the trial court disallowed such evidence because (1) a subsequent analysis determined that the DNA profile of the semen found in the victim matched his profile, and (2) he had failed to file a written motion seeking to introduce evidence of K.'s prior sexual activity to establish an alternative source. *Id.* at 12. In so holding, Bledsoe argues, the trial court ignored his counsel's cross-examination of the DNA expert regarding the "process by which she arrived at her conclusions[.]" *Id.* Further, Bledsoe contends that the trial court ignored the fact that in ***Commonwealth v.***

*Majorana*, 470 A.2d 80 (Pa. 1983), the Pennsylvania Supreme Court held

that the exclusion of evidence of the victim's prior sexual activity, offered to

explain an alternative source of the sperm found on the victim's body,

constituted error, despite the absence of a written motion.  Brief for Appellant

at 12.

The following standard governs our review of the admissibility of

evidence:

> Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion.  Admissibility depends on relevance and probative value.  Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.
>
> Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration.  An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

*Commonwealth v. Borovichka*, 18 A.3d 1242, 1253 (Pa. Super. 2011)

(quoting *Commonwealth v. Levanduski*, 907 A.2d 3, 13-14 (Pa. Super.

2006) (*en banc*) (internal citations omitted)).

In its Opinion, the trial court addressed this claim and concluded that it

lacks merit.  *See* Trial Court Opinion, 2/15/19, at 11-12.  We agree with the

sound reasoning of the trial court, as stated in its Opinion, and affirm on this

basis with regard to Bledsoe's second claim. ***See id.*** We additionally observe the following.

Prior to trial, the trial court specifically asked whether the defense would inquire into the sexual history of the victim. N.T., 7/9/18, at 14. Defense counsel responded, "No." ***Id.*** Nevertheless, defense counsel presented a Motion *in limine* to present evidence, which was revealed in discovery, that the victim was involved in a non-consensual sexual relationship with another man at the time of the alleged incident. ***Id.*** at 15-16. The trial court inquired into the relevance of such evidence in the instant case. ***Id.*** at 16. Although Bledsoe alleged the third-party abuse, he did not claim that such evidence would exculpate him from the instant charges. ***See id.*** at 21. Defense counsel proffered that

> It's not just my client who she supposedly had whatever type of sexual conduct. There are at least two other males that we would allege were having some type of sexual relationship…. [I]f there's trauma and/or issues that go beyond the rape, if there's assaults or other issues, I think that can be brought in, I believe, under the law. Not the actual incident[,] but physical intimidation [is] permitted.

***Id.*** at 22. The trial court deferred ruling on the issue until defense counsel produced law supporting Bledsoe's position. ***Id.*** at 22-23.

At trial, a discussion occurred as to whether defense counsel could challenge the DNA evidence by proving that the semen found in the victim's vagina came from someone other than Bledsoe. ***Id.*** at 92. The trial court ultimately ruled as follows:

[B]ased on what I'm hearing, you really don't have any articulable grounds for challenging the DNA evidence, you don't have an expert report that says the analysis is wrong, [or] any kind of a chain of custody issue that you have evidence that you can proffer. Something like that I would agree with the Commonwealth.

On the other hand, I agree with you that[,] to the extent that they introduced her sexual history with the boy[]friend … to show how the relationship changed, I think, and why there was more of a motive for her to disclose these things to her boy[]friend[,] and how this whole thing surfaced, that you can ask questions to attack the credibility of those statements[,] because you can always do that ….

You're certainly not revealing for the first time that she had sexual relations with this man during the time period that she was having sexual relations with your client, according to what they contend.

I don't think you can[,] and I won't allow you to get into new areas that are unrelated completely to what the Commonwealth was getting into, like, for instance, an alternative source of the semen.

*Id.* at 95-96. Thus, the trial court permitted Bledsoe only to inquire within the scope of the evidence brought out by the Commonwealth. *Id.* at 96-97. We discern no error or abuse of discretion, as there is no indication that the proposed evidence would not have exculpated Bledsoe.

In his third claim, Bledsoe argues that the trial court improperly permitted Dr. Riviello to testify regarding the contents of the victim's medical records. Brief for Appellant at 12. Bledsoe argues that Dr. Riviello was not qualified as a "records custodian." *Id.* Further, Bledsoe argues that the Commonwealth failed to lay the proper foundation to allow the medical records to be admitted as a business record. *Id.* Bledsoe, citing Pa.R.E. 803(6),

asserts that "[m]erely characterizing a document as a business record is insufficient to justify its admission, because a business record, which contains multiple levels of hearsay, is admissible only if each level falls within a recognized exception to the hearsay rule." *Id.* at 13. According to Bledsoe, Dr. Riviello testified regarding the collection of the rape kit swabs from the victim, which were used in the DNA analysis. *Id.* Bledsoe further directs our attention to Dr. Riviello's testimony that the victim had identified Bledsoe as the perpetrator. *Id.* at 12-13. However, Dr. Riviello had no direct knowledge of these events. *Id.* at 13. Because the Commonwealth failed to properly establish any of the requirements for admission of Dr. Riviello's testimony under Pa.R.E. 803(6), Bledsoe asserts that the trial court improperly admitted this evidence at trial. *Id.*

In its Opinion, the trial court determined that Bledsoe waived this claim, by failing to object to the admission of the contested testimony at trial, or in a motion *in limine*. Trial Court Opinion, 2/15/19, at 13. Our review of the record confirms the trial court's analysis, and its conclusion is sound. *See id.* We therefore affirm on the basis of the trial court's Opinion with regard to this claim. *See id.*

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/16/20

Circulated 06/17/2020 08:46 AM

**FILED**

2019 FEB 15 PM 2:42

OFFICE OF JUDICIAL RECORDS
CRIMINAL DIVISION
FIRST JUDICIAL DISTRICT
BY P.A.

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

v.

JOSEPH BLEDSOE

:
:
:
:
:
:
:
:
:
:

CP-51-CR-0006872-2015

CP-51-CR-0006872-2015 Comm v Bledsoe, Joseph
Opinion

8232047841

OPINION

BRONSON, J.                                                                      February 15, 2019

On July 12, 2018, following a jury trial before this Court, defendant Joseph Bledsoe was convicted of one count each of rape (18 Pa.C.S. § 3121(a)(1)), involuntary deviate sexual intercourse ("IDSI") (18 Pa.C.S. § 3123(a)(1)), sexual assault (18 Pa.C.S. § 3124.1), incest (18 Pa.C.S. § 4302(a)), endangering the welfare of a child (18 Pa.C.S. § 4304(a)(1)), corrupting the morals of a minor ("CMOM") (18 Pa.C.S. § 6301(a)(1)(ii)), statutory sexual assault (18 Pa.C.S. § 3122.1(b)), unlawful contact with a minor (18 Pa.C.S. § 6318 (a)(1)), and intimidation in a child abuse case (18 Pa.C.S. § 4958 (a)(2)(ii)). On September 14, 2018, the Court imposed consecutive terms of 10 to 20 years of incarceration for the rape charge, 10 to 20 years of incarceration for the IDSI charge, 10 to 20 years of incarceration for the unlawful contact with a minor charge, and 5 to 10 years of incarceration for the intimidation of a witness charge. In addition, the Court imposed concurrent terms of 3 to 6 years incarceration for the statutory sexual assault charge, 3 ½ to 7 years incarceration for the incest charge, 1 ½ to 3 years incarceration for the endangering a welfare of a child charge, and 1 ½ to 3 years incarceration for the CMOM charge, for an aggregate sentence of 35 to 70 years incarceration.[1]

---

[1] Due to merger, defendant was not sentenced on the sexual assault charge.

1

Defendant filed post-sentence motions on September 21, 2018. On September 25, 2018, the Court granted trial counsel Douglas Dolfman's motion to withdraw as counsel. On September 27, 2018, the Court appointed James Berardinelli to replace Mr. Dolfman and handle the post-sentence motions and any appeal. On October 3, 2018, while post-sentence motions were still pending before this Court, defendant filed a premature *pro se* Notice of Appeal to the Superior Court. On December 28, 2018, the Court denied defendant's post-sentence motions. The order denying his motions perfected defendant's appeal by operation of law. *See Commonwealth v. Cooper*, 27 A.3d 994, 1008 (Pa. 2011) (where premature appeal is filed during pendency of post-trial motions, the trial court retains jurisdiction to decide the motions, and the appeal is deemed to be perfected upon the filing of an order denying the motions). That same day, the Court issued an order directing defendant to file a Concise Statement of Errors Complained of on Appeal pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure.[2]

In his Rule 1925(b) Statement of Errors, defendant claims that: 1) the evidence was legally insufficient to sustain his convictions for rape by forcible compulsion and IDSI by forcible compulsion; 2) the Court "erred in precluding evidence of sexual activity between the complainant and her boyfriend when the intended purpose was to establish the boyfriend as a potential source of the sperm discovered by the complainant's rape kit"; and 3) the Court "erred in permitting Dr. Ralph Riviello to testify to the contents of the complainant's medical records when he had not been qualified as a records custodian and the Commonwealth failed to lay the proper foundation for a business record[.]" Defendant's Concise Statement of Errors

---

[2] Defendant subsequently filed two additional Notices of Appeal to the Superior Court from the same judgment here at issue. On December 12, 2018, defendant refiled the same Notice of Appeal that he had filed on October 3, 2018 (Superior Ct. Docket No. 100 EDA 2019). Then, on January 22, 2019, Mr. Berardinelli filed a counseled Notice of Appeal on behalf of defendant (Superior Ct. Docket No. 255 EDA 2019).

2

Complained of on Appeal ("Statement of Errors") at ¶¶ 1-3. For the reasons set forth below, defendant's claims are either waived or without merit and the judgment of sentence should be affirmed.

## I. FACTUAL BACKGROUND

At trial, the Commonwealth presented the testimony of Philadelphia police officers Geneva Russell, Sean Devlin, and Raymond Smith, Dr. Ralph Riviello, Jannie Rollerson, Christian Vellani, Lizzette Vega, Michelle Kline, and the complainant, K.●[3] Defendant testified on his own behalf. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

Between August of 2013, and February 19, 2015, defendant had a sexual relationship with his biological daughter, K.●, who at the time was between the ages of 15 and 16 and was living with defendant. *See* N.T. 7/10/2018 at 45-46, 53, 56, 113-114. In August of 2013, K.● moved in with defendant and her grandmother in West Philadelphia. N.T. 7/10/2018 at 44-45. Before that, she had lived with her mother, step-father and other siblings, and defendant had been absent from her life since she was approximately 2 or 3 years old. N.T. 7/10/2018 at 46-48.

Defendant and K.●.'s first sexual encounter occurred a few months before she moved in with him. N.T. 7/10/2018 at 46-47, 53. K.● and her younger sister, also defendant's daughter, spent the night at defendant's house. N.T. 7/10/2018 at 46-48. Both girls were watching television on the couch. N.T. 7/10/2018 at 46. After K.●'s sister fell asleep on the couch, defendant brought K.● upstairs to his bedroom and performed oral sex on her, made her perform oral sex on him, and then engaged in vaginal intercourse with her. N.T. 7/10/2018 at 46-47, 49-

---

[3] Since the complainant was a minor at the time of the incident here at issue, she is referred to herein by her initials.

3

50. After having sex with K.███, defendant told her that what they did was their "secret" and that he would get in trouble if she told anyone. N.T. 7/10/2018 at 47.

Shortly after K.███ moved in with defendant in August of 2013, defendant and K.███ began regularly engaging in sexual activity. N.T. 7/10/2018 at 53-55. From that time until the last time they engaged in sexual activity on February 19, 2015, a time period of nearly a year and a half, defendant and K.███ had sex a few times a week. N.T. 7/10/2018 at 53, 56. This included oral and vaginal sex. N.T. 7/10/2018 at 54. During this time, defendant would withhold money, such as money for lunch, or not pay for things like clothes, shoes, and K.███'s cell phone unless K.███ continued having sex with him. N.T. 7/10/2018 at 59-60.

In February of 2015, K.███ told her boyfriend George Campbell[4] about her sexual encounters with her father. N.T. 7/10/2018 at 61-62. Campbell insisted that K.███ should report defendant's conduct to the police, but she did not want to get the police involved. N.T. 7/10/2018 at 62, 67, 70. On February 22, 2015, Campbell came to defendant's house to confront defendant about what K.███ had told him, but defendant demanded that Campbell leave. N.T. 7/10/2018 at 62, 108-109. However, a few hours later, Campbell came back to the house to again confront defendant, but defendant refused to let him inside. N.T. 7/10/2018 at 64-65. K.███ attempted to go outside to see Campbell, but defendant physically restrained her from doing so. N.T. 7/10/2018 at 65-66. Campbell heard the struggle going on inside the house and called the police. N.T. 7/10/2018 at 65. When police arrived, they heard screaming and a commotion coming from inside the house. N.T. 7/10/2018 at 147. Police knocked on the door, identified themselves, and asked the occupants to open the door. *Id.* When defendant opened the door, K.███ rushed out of the house crying. N.T. 7/10/2018 at 147-148. Defendant and Campbell

---

[4] George Campbell is also known as "Luchiano." N.T. 7/10/2018 at 60.

4

started yelling at each other, and defendant proceeded to run towards Campbell. N.T. 7/10/2018 at 148-149. Police ordered defendant to stop and then physically restrained him when he failed to do so. N.T. 7/10/2018 at 149. After police put defendant in the back of their vehicle, defendant began yelling for K.● and saying he wanted to speak to her. N.T. 7/10/2018 at 150. Meanwhile, K.● informed Officer Geneva Russell that defendant had been sexually abusing her. N.T. 7/10/2018 at 23-24, 67. When this information was relayed to the other officers on the scene, defendant was placed under arrest. N.T. 7/10/2018 at 150-151.

After K.● disclosed to Officer Russell that defendant had been sexually abusing her, K.● was transported to Philadelphia's Children Alliance, where she told staff about her sexual relationship with defendant. N.T. 7/10/2018 at 77-78. On February 23, 2018, a sexual assault nurse performed a forensic examination on K.● and collected DNA from inside her vagina. N.T. 7/10/2018 at 78; N.T. 7/11/2018 at 5, 31-32. Later, detectives collected DNA swabs from defendant and Campbell. N.T. 7/11/2018 at 6, 60, 64. The DNA found inside K.●'s vagina matched that of defendant. N.T. 7/11/2018 at 96.

On March 8, 2015, defendant called K.● from prison and instructed her to tell detectives that her boyfriend, Campbell, had pressured her to fabricate that defendant was having sex with her. N.T. 7/10/2018 at 80-83. That same day, K.● went to the Special Victims Unit and did as defendant instructed. N.T. 7/10/2018 at 82-83.

On June 7, 2015, defendant sent a letter from prison to K.● instructing her to lie to authorities and tell them that she and Campbell had planted defendant's semen in her vagina. N.T. 7/10/2018 at 85-88. Again, K.● did as defendant instructed and testified at defendant's preliminary hearing on June 18, 2015, that she and Campbell had planted defendant's semen in her vagina. N.T. 7/10/2018 at 88-89.

5

## II. DISCUSSION

### A. *Sufficiency of the Evidence*

Defendant first claims that "the evidence was insufficient to establish the offenses of Rape by Forcible Compulsion and Involuntary Deviate Sexual Intercourse by Forcible Compulsion. . ." Statement of Errors at ¶ 1. Specifically, defendant claims that the Commonwealth failed to establish that the sexual intercourse was accomplished through forcible compulsion. *Id.* This claim is without merit.

In considering a challenge to the sufficiency of the evidence, the Court must decide whether the evidence at trial, viewed in the light most favorable to the Commonwealth, together with all reasonable inferences therefrom, could enable the fact-finder to find every element of the crimes charged beyond a reasonable doubt. *Commonwealth v. Walsh*, 36 A.3d 613, 618 (Pa. Super. 2012). In making this assessment, a reviewing court may not weigh the evidence and substitute its own judgment for that of the fact-finder, who is free to believe all, part, or none of the evidence. *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011). The Commonwealth may satisfy its burden of proof entirely by circumstantial evidence. *Id.* Finally, "[i]f the record contains support for the verdict, it may not be disturbed." *Commonwealth v. Adams*, 882 A.2d 496, 499 (Pa. Super. 2005) (quoting *Commonwealth v. Burns*, 765 A.2d 1144, 1148 (Pa. Super. 2000), *app. denied*, 782 A.2d 542 (Pa. 2001)).

To sustain a conviction for rape, the Commonwealth must establish that the defendant "engage[d] in sexual intercourse with a complainant [*inter alia*]: (1) [b]y forcible compulsion...." 18 Pa.C.S. § 3121(a)(1). To sustain a conviction for involuntary deviate sexual intercourse, the Commonwealth must prove that the defendant "engage[d] in deviate sexual

6

intercourse with a complainant [*inter alia*]: (1) by forcible compulsion...." 18 Pa.C.S. §

3123(a)(1). Deviate sexual intercourse is defined to include oral intercourse. 18 Pa.C.S. § 3101.

Here, defendant does not challenge that he had vaginal and oral intercourse with his

biological daughter, but contends that the intercourse was not accomplished through forcible

compulsion. The test for forcible compulsion for rape and IDSI is identical. *Commonwealth v.*

*Smolko*, 666 A.2d 672, 675 (Pa. Super. 1995) (citation omitted). The phrase "forcible

compulsion" includes physical force or violence, as well as "moral, psychological or intellectual

force used to compel a person to engage in sexual intercourse against that person's will."

*Commonwealth v. Rhodes*, 510 A.2d 1217, 1226 (Pa. 1986); *see also Commonwealth v. Eckrote*,

12 A.3d 383, 387 (Pa. Super. 2010); 18 Pa.C.S. § 3101. "[T]he mere existence of a parent-child

relationship, without more," does not constitute forcible compulsion. *Commonwealth v. Titus*,

556 A.2d 425, 430 (Pa. Super. 1989). For forcible compulsion, courts consider the totality of the

circumstances, including the following factors:

> the respective ages of the victim and the accused, the respective mental and
> physical conditions of the victim and the accused, the atmosphere and physical
> setting in which the incident was alleged to have taken place, the extent to which
> the accused may have been in a position of authority, domination or custodial
> control over the victim, and whether the victim was under duress. This list of
> possible factors is by no means exclusive.

*Commonwealth v. Frank*, 577 A.2d 609, 618–19 (Pa. Super.), *app. denied*, 584 A.2d 312 (Pa.

1990) (quoting *Rhodes*, 510 A.2d at 1226); *see Commonwealth v. Dorman*, 547 A.2d 757, 762

(Pa. Super. 1988), *app. denied*, 571 A.2d 380 (Pa. 1989) (finding important factor to be that

defendant, "who was the victim's uncle, occupied a position of authority and trust such that the

victim would feel coerced to submit to his demands out of a sense of duty or obedience").

Here, the evidence clearly established that defendant, who was in his late 40s, forced

K.█, who was 15 or 16 years old and defendant's biological daughter, to have sex with him by

7

preying upon her vulnerability and by exercising his parental authority and control. First, defendant knew that K.█ was in a particularly vulnerable position when she moved in with him, as he testified that K.█ confided in him that her step-father, Timothy Rollerson, had been sexually abusing her since she was approximately 7 years old. N.T. 7/12/2018 at 17. Defendant further testified that K.█ asked him not to tell anyone about this sexual abuse. *Id.* He also stated that he believed K.█. had moved in with him to get away from her step-father, as she "practically begged" to live with him to escape her step-father. N.T. 7/12/2018 at 17-18. Therefore, K.█. was essentially trapped at defendant's home, because her only other option was to live with a man who had been sexually abusing her since she was 7. Moreover, defendant knew he could initiate a sexual relationship with K.█ without resistance or fear of being discovered because Mr. Rollerson had been sexually abusing K.█, and K.█ did not want that abuse disclosed.

In addition, defendant manipulated and controlled K.█ by withholding favorable treatment from her unless she continued to engage in sexual intercourse with him. K.█. lived with defendant full time and relied on defendant for food, clothing, and other necessities. N.T. 7/10/2018 at 58-60. Defendant often refused to pay for K.█'s clothing and cell phone unless she had sex with him. *See* N.T. 7/10/2018 at 59-60.

Defendant also took considerable measures to emotionally control K.B by trying to isolate her from other family members and other men. K.█ testified that defendant would tell her that their sexual relationship was their "secret" and that "he made [K.█.] specifically for him and he loved [K.█]. . ." N.T. 7/10/2018 at 57. K.█ and her mother, Jannie Rollerson, both testified that defendant would frequently call K.█ when mother and daughter were together to see what K.█ was doing and to find out when K.█ was coming home. N.T. 7/10/2018 at 58-59,

8

137-138. In addition, Ms. Rollerson testified that defendant would tell K. that her mother did not love her. N.T. 7/10/2018 at 141. K. also testified that when defendant learned she was dating George Campbell, defendant said things to her, such as: "He was too old for me, we were pretty far in age and he didn't really love me, didn't really care about me, didn't have a job. Just he was not good, I guess." N.T. 7/10/2018 at 64.

Moreover, the evidence established that K. was coerced to engage in a sexual relationship with defendant out of a sense of duty or obedience. When asked what she thought when her father told her not to tell anyone after the first time they had sex, K. replied: "I just listened and I didn't tell anybody. I thought maybe to myself that it was wrong, but I guess I was just listening to my dad and I didn't tell anybody because he didn't want me to." N.T. 7/10/2018 at 52-53. K. testified that even after she disclosed defendant's sexual abuse to Campbell, she did not want to get the police involved and have her father get in trouble. N.T. 7/10/2018 at 67, 70.

The extent of defendant's domination and emotional control over K. was exemplified by events that took place after defendant was arrested. The Commonwealth introduced evidence of a phone call to K. defendant made while in prison and a letter defendant sent to K. *See* N.T. 7/10/2018 at 80-82, 85-88. On March 8, 2015, before DNA testing showed that defendant's DNA matched the semen found in K.'s vagina, defendant called K. from prison and directed her to tell detectives that her boyfriend, Campbell, pressured her to fabricate that defendant was having sex with her. N.T. 7/10/2018 at 80-83; *see also* N.T. 7/11/2018 at 6-7. K. testified that she did as defendant instructed because she "just wanted to get him out of it, like [defendant] said, and make everything go back to normal." N.T. 7/10/2018 at 82. On June 7, 2015, after DNA testing showed defendant's DNA was present in K.'s vagina, defendant sent a letter from

9

prison to K.● instructing her to falsely say that she and her boyfriend had planted defendant's semen in her vagina. N.T. 7/10/2018 at 85-88. The contents of the letter are as follows:

Hey [K.●], did you get the first letter I sent you? I was waiting for you to write back. I received your letter last month. Sorry that things are not going well for you, but I'm glad you wrote me because there is so much I need to say to you.

Please, [K.●], help me get out of this. O.k. They say that they have DNA from the swab they took from you that night. They say my sperm was on it. You have to say that with George's help you put it there. O.k. That should help a lot.

I'm getting a lawyer to help me and as long as you say nothing happen and that y'all planted the sperm, I should be o.k.

I can't call you because they are recording my phone calls with you. O.k.

So don't think I'm not calling because I want to but I can't.

We have a Court date coming up June 18th. I hope you can be ready to stand up and tell them everything.

Talk to my sister Joyce. Let her know that you need help to undo what you do. Maybe the lawyer can help you talk to my family, my mother, Aunt Joyce. Y'all work together to get me out this. O.k.

Please, [K.●.], if we would can just get over this everything will be alright. I promise.

You have to tell them you planted the DNA from a used condom that I had because I had girls over there all the time. Make up a good story and stick to it. O.k.

I need your help with this [K.●]. You said you would do anything to help. This is it and no you can't say it was consensual. That would still hurt me so don't say that.

Say that you with the help of George fabricated this whole story along with planting the DNA so that y'all could be together because I wouldn't allow it. O.k.

Please write back. I'm not so alone here. I could use somebody to talk to.

Do you know what you have to do because I'm counting on you to be strong and not care what people think. Let's just get throug[h] this.

10

Did you get the first letter I sent you or someone is taking your mail at your mom house? Let me know so I won't send anymore letters there. I'll send them to my mom's house. O.k.

Write back or let my mom know that you know what you have to do in Court o.k. so that I can rest assured and not worry.

I hope you got my back. Just tell me you do and I can trust you. That would help a lot, [K.B.]. Take it easy out there and love yourself. O.k. And hurry up and get me home so I can look out for you. O.k. Write back ASAP. Need to know what's up.

Love, dad.

N.T. 7/10/2018 at 85-88. K.● testified that after reading the letter she was afraid of what would happen to defendant and that she just "wanted everything to go away." N.T. 7/10/2018 at 88. Therefore, K.● did as defendant told her and told the fabricated story at defendant's preliminary hearing. N.T. 7/10/2018 at 89.

Accordingly, the record contained clearly sufficient evidence, beyond the mere existence of defendant and K.●'s relationship as father and daughter, to allow a reasonable fact-finder to conclude, beyond a reasonable doubt, that defendant was guilty of rape by forcible compulsion and IDSI by forcible compulsion.

*B. Excluding Evidence of Sexual Activity between Complainant and Her Boyfriend*

Defendant next claims that the Court "erred in precluding evidence of sexual activity between the complainant and her boyfriend when the intended purpose was to establish the boyfriend as a potential source of the sperm discovered by the complainant's rape kit[.]" Statement of Errors at ¶ 2.

Under Pennsylvania's Rape Shield Law, evidence of a victim's past sexual conduct is generally not admissible. 18 Pa.C.S. § 3104(a). Evidence of a victim's sexual interaction with a third party offered as an explanation of the source of semen in the victim's body may be

11

admissible at trial. *See, e.g., Commonwealth v. Majorana*, 470 A.2d 80, 84-85 (Pa. 1983).

However, "a defendant who desires to introduce evidence of the victim's prior sexual conduct

must file a written motion and make a specific offer of proof prior to trial." *Commonwealth v.*

*Burns*, 988 A.2d 684, 690 (Pa. Super. 2009), *app. denied*, 8 A.3d 341 (Pa. 2010) (citations

omitted); *see also* 18 Pa.C.S. § 3104(b). A trial court's ruling on the admissibility of such

evidence will be reversed only where there has been a clear abuse of discretion. *Commonwealth*

*v. K.S.F.*, 102 A.3d 480, 483 (Pa. Super. 2014) (citation omitted).

Here, the evidence was properly excludable since defendant never filed the requisite

pretrial motion seeking to introduce the evidence. *Burns*, 988 A.2d at 690; 18 Pa.C.S. § 3104(b).

In any event, defendant's claim is frivolous, since he *did* explore K.●.'s sexual relationship with

her boyfriend, Campbell. Defense counsel's cross-examination of K.● included the following:

| **[Defense counsel]:** | You said you had a sexual relationship with [Campbell], correct? |
| [K.●]: | Yes. |
| **[Defense counsel]:** | You were having a sexual relationship, according to you, with [Campbell] and your dad at the same time? |
| [K.●]: | Yes. |
| **[Defense counsel]:** | Was it for those five months, according to you? |
| [K.●]: | Yes. |
| **[Defense counsel]:** | From November of 2014 through February of 2015 when everything ended? |
| [K.●]: | Yes. |

N.T. 7/10/2018 at 104-105.

Moreover, the DNA analysis positively identified defendant as the source of the semen in

K.●'s vagina, and positively excluded Campbell as the source of the semen. N.T. 7/11/2018 at

96. Defendant did not hire an expert to challenge this finding, and counsel's cross-examination

of the DNA expert failed to cast any doubt on the expert's conclusions. *See* N.T. 7/10/2018 at

99-105. Accordingly, any effort to demonstrate, through further cross-examination of K.●

about her sex life with her boyfriend, would not have exculpated defendant. No relief is due.

12

*C. Admission of Complainant's Medical Records*

Defendant's final claim is that the Court "erred in permitting Dr. Ralph Riviello to testify to the contents of the complainant's medical records when he had not been qualified as a records custodian and the Commonwealth failed to lay the proper foundation for a business record[.]" Statement of Errors at ¶ 3.

"A party may claim error in a ruling to admit ... evidence only ... [if that] party, on the record ... makes a timely objection, motion to strike, or motion *in limine*." Pa.R.E. 103(a). Here, defendant never objected in the trial court at any time to any portion of the testimony of Dr. Riviello on any grounds. *See* N.T. 7/11/2018 at 7-54 (testimony of Dr. Riviello). Because defendant never made a timely objection to the challenged testimony, and raises his claim for the first time on appeal, it is waived. Pa.R.E. 103(a); Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Commonwealth v. Stevenson*, 894 A.2d 759, 766 (Pa. Super. 2006), *app. denied*, 917 A.2d 846 (Pa. 2007) (same).

## III. CONCLUSION

For all of the foregoing reasons, the Court's judgment of sentence should be affirmed.

BY THE COURT:

_____
GLENN B. BRONSON, J.

13